# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| AARON NAPARSTEK, on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br>    v.<br><br>VOLKSWAGEN GROUP OF AMERICA, INC.,<br><br>        Defendant. | C.A. No.: 1:15-cv-13418<br><br>**Class Action Complaint** |

Plaintiff Aaron Naparstek, by and through his counsel, brings this Class Action Complaint against Defendant Volkswagen Group of America, Inc., on behalf of himself and those similarly situated, for common law fraud, breach of contract, breach of the covenant of good faith and fair dealing, breach of express warranty, breach of the implied warranty of merchantability, and violation of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq.*

As detailed below, Volkswagen intentionally designed and sold diesel Volkswagen and Audi cars with software (referred to by the Environmental Protection Agency as a "defeat device") that turns on full pollution controls only when the car is undergoing official emissions testing and misled consumers about the amount of pollution those cars created during ordinary use. Despite touting itself as an environmentally conscientious company and its cars as "green," "clean," and "environmentally friendly," Volkswagen sold hundreds of thousands of consumers expensive cars that produced pollution 10 to 40 times the legal limits, and intentionally and knowingly lied about those cars to increase its sales and profits.

Plaintiff brings this suit on behalf of himself and proposed nationwide and Massachusetts classes to obtain damages (both actual and punitive), restitution, and to enjoin Volkswagen from continuing to deceive consumers.

## PARTIES

1.     Plaintiff Aaron Naparstek ("Plaintiff") is an individual who currently resides in Brooklyn, New York.

2.     Defendant Volkswagen Group of America, Inc. ("Volkswagen") is a New Jersey corporation with its principal place of business at 2200 Ferdinand Porsche Dr., Herndon, Virginia 20171. Volkswagen is doing business in every U.S. state and the District of Columbia.

3.     Volkswagen designs, manufactures, markets, distributes, and warrants cars in the United States under the Volkswagen and Audi brand names. Volkswagen recently surpassed Toyota to become the world's top-selling automaker, with diesel engine cars accounting for over 20 percent of its sales.

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over the subject matter of this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because it is a class action in which at least one member of the class is a citizen of a State different from Volkswagen, there are over 100 class members, and the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

5.     This Court has personal jurisdiction over Volkswagen because it conducts business in Massachusetts, has sufficient minimum contacts with Massachusetts, and intentionally avails itself of the markets within Massachusetts through the promotion, marketing, and distribution of its vehicles.

6.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred and/or emanated from this District, and because Volkswagen has caused harm to class members residing in this District.

## FACTS

7.     This case concerns Volkswagen's marketing, advertising, and sale of Volkswagen and Audi branded cars with so-called "CleanDiesel" engines, including the following:

| Model Year(s) | Make and Model(s) |
|---|---|
| 2009 – 2015 | VW Jetta |
| 2009-2014 | VW Jetta Sportwagen |
| 2013 – 2015 | VW Beetle |
| 2013-2015 | VW Beetle Convertible |
| 2010 – 2015 | Audi A3 |
| 2010 – 2015 | VW Golf |
| 2015 | VW Golf Sportwagen |
| 2012-2015 | VW Passat |

These cars are collectively referred to as the "Defeat Device Vehicles." As described more fully below, the Environmental Protection Agency ("EPA") and California Air Resources Board ("CARB") are currently investigating whether Volkswagen installed defeat devices in other vehicle models as well. In a press release issued on September 22, 2015, Volkswagen admitted that the defeat device software was installed in vehicles with "Type EA 189 engines." Additional vehicle models and model years may be added to this action when new facts are discovered.

**A. Regulation of Diesel Vehicles in the United States.**

8.  Diesel-fueled cars declined in popularity in the United States in the 1980s and 1990s, largely due to increased awareness of the pollution diesel-engines caused. In particular, diesel engines' combustion process, which uses highly compressed hot air to ignite fuel rather than using a spark plug as utilized by gasoline engines, produces high levels of noxious gases and particulates, including oxides of nitrogen (NOx).

9.  NOx are a highly reactive group of gases that create multiple environmental problems, including smog, ground-level ozone, acid rain, and

global warming, among others.  Nox also create many public health hazards, such as causing or exacerbating asthma, bronchitis, and pneumonia.

10.   In part to remedy these problems, the United States Government, passed the Clean Air Act to protect citizens from pollution, including NOx emissions.  The Clean Air Act and the Environmental Protection Agency's ("EPA") enabling regulations prohibit the sale of any vehicle in the United States that does not comply with emissions regulations set by the EPA. The EPA also requires vehicle manufacturers to certify that vehicles sold in the United States meet the applicable federal emissions standards to control air pollution. 42 U.S.C. § 7522; 40 C.F.R. § 86.1843-01.

11.   The EPA implemented its current regulations, Tier 2, between 2004 and 2009. These regulations apply to all light-duty vehicles regardless of the fuel that they use. The Tier 2 regulations include certification levels of different levels of stringency, called certification bins.

12.   Volkswagen chose to certify the Defeat Device Vehicles to the Tier 2, Bin 5 standard, which has a maximum allowable NOx level of .05 g/mi for a vehicle's intermediate life (5 years/50,000 miles) and .07 g/mi for a vehicle's full useful life (10 years/120,000 miles). 40 C.F.R. § 86.1811-04(c).

13.   In addition, EPA regulations specify that a manufacturer's fleet average of NOx for any given model year must be under .07 g/mi. Id. at § 86.1811-04(d).

14.   Under federal law, cars equipped with defeat devices, meaning hardware or software that reduces the effectiveness of the vehicle's emissions control system during normal driving conditions, cannot be certified. *See* EPA, *Advisory Circular Number 24: Prohibition on use of Emission Control Defeat*

*Device* (Dec. 11, 1972); *see also* 42 U.S.C. § 7522(a)(3)(B); 40 C.F.R. §§ 86-1809-01, 86-1809-10, 86-1809-12.

**B. Volkswagen's Marketing and Sales of "CleanDiesel" Cars.**

15.   In response to these stringent regulations, Volkswagen purported to research and develop diesel technology with exhaust emission treatment systems that produced less pollution and could pass United States emission standards. By the late 2000s, Volkswagen claimed to have done so with its 2.0L TDI (Turbocharged Direct Injection) "CleanDiesel" engine.

16.   To overcome consumer perceptions of "dirty" diesel vehicles and to lure consumers to purchase its "CleanDiesel" vehicles, Volkswagen engaged in a major marketing campaign, creating numerous webpages, press releases, and television commercials that emphasized the low emissions and environmental benefits of its "CleanDiesel" vehicles. Further, taking advantage of rising fuel prices to emphasize diesel engines' fuel-efficiency and high torque outputs, Volkswagen told consumers they could have it all—power, fuel efficiency, *and* low emissions—if they paid a few thousand dollars more for its "clean" diesel vehicle. Indeed, Volkswagen, in emphasizing the performance aspects of its "TDI CleanDiesel" engine, advertised, "Cake. Eating it too."

17.   In August 2008, Volkswagen kicked off the campaign by announcing that the 2.0L TDI engine was the first diesel vehicle engine compliant in all fifty states under modern emission standards. CEO Stefan Jacoby stated: "Hybrids have dominated the discussion of environmentally positive vehicles in recent years. The highly fuel efficient, 50 state emissions certified Jetta TDI shows that advanced clean diesel has arrived and is poised to change this dynamic. With its affordable price point, refined ride and handling, and high fuel economy, the

Jetta TDI shows that hybrids now have a strong competitor in the marketplace." Further, Jacoby claimed that the clean diesel Jetta model "truly offer[s] a no compromise alternative fuel driving experience that provides our customer the best of both worlds—excellent fuel efficiency combined with a dynamic driving experience."

18.   In November 2008, the Volkswagen Jetta TDI was awarded the 2009 Green Car of the Year by Green Car Journal. Likewise, the Audi A3 TDI was awarded the 2010 Green Car of the Year. Volkswagen touted both of these accolades in its marketing materials and advertisements.

19.   In a November 21, 2008, press release available on its website, Volkswagen specially emphasized its emissions compliance, describing how the "[f]uel efficiency, performance and convenience come standard with the 50-state compliant Jetta TDI sedan and SportWagen models, which meet the most stringent emissions standards in California."

20.   Another Volkswagen promotion suggested that clean diesel vehicles were a "new alternative for shoppers craving efficiency, low emissions, and unrivaled value all in one attractive package." Most of all, Volkswagen tried to distance itself from consumer perceptions of dirty diesel emissions, describing how "[t]hose old realities no longer apply." Attached hereto as Exhibit A are examples of images that appeared on Volkswagen's websites promoting the environmental friendliness of its clean diesel vehicles.

21.   On the "Environment" page of its website, Volkswagen stated that it takes "environmental responsibility very seriously. When it comes to making our cars as green as possible, Volkswagen has an integrated strategy focused on reducing fuel consumption and emissions, building the world's cleanest diesel

engines and developing totally new power systems, which utilize new fuel alternatives."

22.   To further emphasize the company's environmental focus, Volkswagen created a campaign devoted to promoting environmental sustainability called "Think Blue." According to Volkswagen's Think Blue campaign, the company is dedicated to sustainable mobility and eco-friendly living, and its diesel vehicles are part of an environmentally friendly lifestyle. The TDI engine webpage states that "TDI represents one part of the Volkswagen Think Blue initiative, our goal of creating and encouraging ecoconscious products and behaviors." Think Blue is "about being more responsible on the road and more environmentally conscious—not just in our cars."

23.   Other statements about clean diesel in Volkswagen marketing materials included how:

a. Clean diesel is "[f]or the eco-conscious and the high-performance-conscious;"

b. Clean diesel is "more efficient, eco-conscious, and fun to drive;"

c. Clean diesel technology "impacts fuel efficiency and performance, while being a more eco-conscious choice;" and

d. Volkswagen's manufacturing "continues to refine and perfect the clean diesel technology we have pioneered, which delivers a dramatic reduction in both fuel consumption and exhaust emissions and offers some of the cleanest and most efficient alternatives on the market today."

24.   Defendant also supported and directed a website to promote its "CleanDiesel" technology, www.clearlybetterdiesel.org.  The website touts "CleanDiesel" as reducing smog and "meet[ing] the highest standards in all 50

7

states, thanks to ultra-low sulfur diesel (ULSD) fuel and innovative engine technology that burns cleaner." Attached hereto as <u>Exhibit B</u> are examples of images from the ClearlyDiesel webpage promoting the environmental benefits of CleanDiesel.

**C. Defendant Charged a Premium for its Clean Diesel Vehicles.**

25.   Defendant charges substantial premiums for the Defeat Device Vehicles. For example, for the 2015 Volkswagen Jetta, the base S model with a gasoline engine has a starting MSRP of $18,780. The same vehicle with a TDI CleanDiesel engine, however, has a starting MSRP of $21,640, a price premium of $2,860. The CleanDiesel premium for the highest trim Jetta models with a comparable gasoline engine is substantially higher: The Jetta SE has a starting MSRP of $20,095, while the same model with a TDI CleanDiesel engine has a MSRP of $26,410, a $6,315 premium.

26.   These premiums occur across all of the vehicles in which Defendant installed its "defeat device" for emissions testing. The table below sets forth the price premium for each comparable base, mid-level, and top-line trim for each affected model:

| Model | Base | Mid-Level | Full Trim |
|-------|------|-----------|-----------|
| VW Jetta | $2,860 | $4,300 | $6,315 |
| VW Beetle | $4,635 | n/a | $2,640 |
| VW Golf | $2,950 | $1,000 | $1,000 |
| VW Passat | $5,755 | $4,750 | $6,855 |
| Audi A3 | $2,805 | $3,095 | $2,925 |

**D.  Volkswagen's Marketing and Advertising of its CleanDiesel Vehicles Is False and Misleading**

27.  Contrary to Volkswagen's self-promotion as a "green" company, and its advertisement of its CleanDiesel vehicles as "clean" and complying with emission standards, the Defect Device Vehicles fail environmental regulations.

28.  On September 18, 2015, the EPA issued a Notice of Violation ("NOV") to Volkswagen. A true and correct copy of the NOV is attached hereto as Exhibit C.  The NOV explains that Volkswagen has installed manipulative software in the Defect Device Vehicles that circumvents EPA emissions standards for NOx. Volkswagen's "CleanDiesel" engines use computerized engine control systems to monitor sensors throughout the Defect Device Vehicles' engine and exhaust systems to control operation of the car's systems to ensure optimal performance and efficiency. These functions include controlling fuel injection, valve and ignition timing, and operating the engine's turbocharger. The engine control computer can, for example, ensure that the air-to-fuel mixture is correct based on sensor readings such as throttle position, amount of air flowing into the engine, and engine temperature.

29.  The NOV explains that the Defect Device Vehicles' computerized engine control system software detects when the vehicles are undergoing official emissions testing and "and turns full emissions controls on only during the test."  During normal operation of the vehicle, however, the emissions controls are deactivated, permitting the Defect Device Vehicles to release NOx far in excess of those allowed by federal and state clean air regulations. This software produced and used by Volkswagen is a "defeat device" as defined by the Clean Air Act.

30.  The software in the Defect Device Vehicles measures factors including the position of the steering wheel, the vehicle's speed, duration of the engine's

operation, and barometric pressure to sense when the car was being subjected to testing and then configured itself to reduce NOx emissions. These inputs track the parameters of the federal and state procedures used for certification testing.

31.   Accordingly, Volkswagen's software in the Defect Device Vehicles allows the cars to meet emissions standards in labs or state testing stations, while permitting the vehicles to emit NOx at up to 40 times the standard allowed under United States laws and regulations during the normal operation of the vehicles. By manufacturing and selling cars with defeat devices that allowed for higher levels of emissions than were certified to the EPA, Volkswagen violated the Clean Air Act and defrauded its customers.

**E.   Volkswagen Knowingly and Intentionally Defrauded Consumers.**

32.   Defendant and/or its agents designed the CleanDiesel engines and engine control systems in the Defeat Device Vehicles, including the "defeat device." Defendant also developed and distributed owners' manuals and warranty booklets, advertisements, and other promotional materials relating to the Defeat Device Vehicles.

33.   Indeed, in a meeting with CARB and EPA staff on September 3, 2015, Volkswagen admitted that the Defect Device Vehicles were designed and manufactured with the defeat device in the form of a sophisticated software algorithm that detected when the vehicle was being tested for emissions standards. Thus, Volkswagen has admitted that its CleanDiesel vehicles used software deliberately designed to cheat the emissions tests.

34.   In a statement on September 20, 2015, Volkswagen AG's Chief Executive Officer Martin Winterkorn said the company was "deeply sorry that

10

we have broken the trust of our customers and the public." Regarding the allegations by the EPA, a spokesperson for Volkswagen stated: "We have admitted it to the regulator. It is true. We are actively cooperating with the regulator." Volkswagen also announced that it was halting sales of all 2.0L TDI engine vehicles in the United States. Michael Horn, the president and CEO of Volkswagen Group of America, said the company had "totally screwed up."

**F.   Plaintiff's Injury.**

35.   Plaintiff bought a new 2014 Volkswagen Jetta SportWagen with a 2.0L TDI engine from Boston Volkswagen located in Watertown, Massachusetts on December 13, 2013. Plaintiff paid approximately $34,000.00 for the Jetta.

36.   Plaintiff is the founding editor and creator of Streetsblog, a website providing daily coverage of transportation, land use and environmental issues in New York City. Since its founding in June 2006, Streetsblog has emerged as an influential forum for New York City's Livable Streets Movement, dedicated to reclaiming cities' public spaces from the automobile and improving conditions for pedestrians, cyclists and transit users. Plaintiff is a well-known environmental activist and has given presentations to car manufacturers on issues such as urban planning and livable streets.

37.   Plaintiff purchased the 2014 Jetta in large part, because he believed it was fuel efficient and good for the environment. Before purchasing his vehicle, Plaintiff spent months researching his options for a fuel-efficient hatchback vehicle that had low emissions. Plaintiff reviewed Volkswagen's promotional materials for its CleanDiesel TDI engines and Jetta SportWagen TDI. Plaintiff specifically recalls reviewing Volkswagen materials, which stated that the Jetta

TDI was "green," "clean," "environmentally conscious," and had "high fuel efficiency and performance with low emissions."

38. None of Volkswagen's materials disclosed that the vehicle failed to comply with applicable emissions regulations or that Volkswagen had installed a defeat device in its vehicles. Plaintiff chose to purchase his vehicle instead of competing products based on these representations. Thus, Plaintiff reasonably believed at the point of sale that his vehicle was green, eco-conscious, complied with applicable emissions standards, and did not contain a defeat device.

39. Had Plaintiff known that the 2014 Volkswagen Jetta SportWagen TDI did not comply with applicable federal emission standards, or polluted the environment at a rate up to 40X the federal limit, he would not have purchased it. As a result, Plaintiff has sustained an out of pocket loss in (i) the full amount that he paid for the vehicle or, at a minimum, (ii) the price premium he paid for the vehicle with a CleanDiesel engine.

### G. Plaintiff and Class Members Have Suffered Losses as a Result of Volkswagen's Fraud.

40. The EPA has ordered Volkswagen to recall the Defeat Device Vehicles and repair them so that they comply with EPA emissions requirements at all times during normal operation.  However, purchasers of the Defeat Device Vehicles have and will continue to suffer significant harm.

41. Although technology exists to reduce the amount of nitrogen oxides emitted by diesels, Volkswagen cannot make the Defeat Device Vehicles comply with emissions standards without substantially degrading their performance characteristics, including their horsepower and fuel economy. The software installed by Volkswagen on the Defeat Device Vehicles sidestepped this trade-off by giving a misleadingly low nitrogen oxide reading during tests.

Thus, even if Volkswagen is able to make Class members' Defeat Device Vehicles EPA compliant, Class members will nonetheless suffer actual harm and damages because their vehicles will no longer perform as they did when purchased and as advertised.  Each and every Class member paid too much for the Defeat Device Vehicles.

42.   Additionally, Plaintiff and Class members will be required to spend additional sums on fuel and will not obtain the performance characteristics of their vehicles as promised when purchased. Moreover, affected vehicles will necessarily be worth less in the marketplace because of their decrease in performance and efficiency, which means that owners of Defeat Device Vehicles will not be able to recoup nearly as much value in the future. Before the EPA uncovered Volkswagen's fraudulent practices, the resale value of the Defeat Device Vehicles was very high; indeed, they were difficult to find used. This will undoubtedly change in light of Volkswagen's fraud.

43.   Thus, as a result of Volkswagen's unfair, deceptive, and/or fraudulent business practices, and its failure to disclose that under normal operating conditions the Defeat Device Vehicles emit 40 times the allowed levels, owners and/or lessees of the Defeat Device Vehicles have suffered losses in money and/or property.

### H.   Class Allegations

44.   In addition to his individual claims, Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following class and subclass (collectively the "Classes"):

    a.   **The Nationwide Class:** All persons or entities in the United States who purchased or leased a "Defeat Device Vehicle."

Defeat Device Vehicles include, without limitation: Model Year ("MY") 2009-2015 VW Jetta; MY 2009-2014 Jetta Sportwagen; MY 2013-2015 VW Beetle; MY 2013-2015 VW Beetle Sportwagen; MY 2010-2015 VW Golf; MY 2015 VW Golf Sportwagen; MY 2012-2015 VW Passat; and MY 2010-2015 Audi A3.

    b.  **The Massachusetts Subclass**: All persons or entities who purchased or leased a "Defeat Device Vehicle" in the state of Massachusetts.

45.  Excluded from the Classes are Volkswagen, its affiliates, successors and assigns, officers and directors, and members of their immediate families.

46.  This action may be properly maintained as a class action because it meets all of the requirements of Rule 23 of the Federal Rules of Civil Procedure.

    **1.  Numerosity, Federal Rule of Civil Procedure 23(a)(1)**

47.  The proposed Class is so numerous and geographically dispersed that joinder of all members is impracticable. Plaintiff does not yet known the precise number of members in the Classes, but he estimates that it is well in excess of 1,000 people. Volkswagen has over 450,000 Defeat Device Vehicles.

    **2.  Commonality and Predominance, Federal rules of Civil Procedure 23(a)(2) and 23(b)(3).**

48.  There are questions of law and fact that are common to the Classes that predominate of any question affecting individual class members, including, but not limited to, the following:

    •    Whether Volkswagen designed, manufactured, marketed, and distributed Defeat Device Vehicles with a "defeat device";

- Whether Volkswagen knew about the "defeat device" and, if so, how long Volkswagen has known;

- Whether the Defeat Device Vehicles fail to comply with applicable federal and state emissions regulations as a result of the defeat device;

- Whether Volkswagen knowingly or intentionally concealed the existence of the defeat devices from consumers;

- Whether Volkswagen knowingly or intentionally misled consumers about the emissions control and performance characteristics of the Defeat Device Vehicles;

- Whether the existence of the defeat device and its consquences would be considered material by an objectively reasonable person;

- Whether the Defeat Device Vehicles can be made to comply with federal and state emissions standards without substantially degrading the performance and/or efficiency of the Defeat Device Vehicles;

- Whether Volkswagen charged a price premium for the Defeat Device Vehicles, and, if so, how much;

- Whether class members are entitled to injunctive relief and other equitable relief and, if so, what is the nature of such relief; and

- Whether class members are entitled to payment of actual, incidental, consequential, exemplary, punitive, and/or statutory damages plus interest, and if so, what is the nature of such relief.

### 3.    Typicality, Federal Rule of Civil Procedure 23(a)(3).

49.   Plaintiff's claims against Volkswagen are typical of the claims of the Classes because Plaintiff and all other members of the classes purchased a Defeat Device Vehicle from Volkswagen. With respect to the class allegations, Plaintiff was subject to the exact same business practices and representations.

### 4.    Adequacy, Federal Rule of Civil Procedure 23(a)(4).

50.   Plaintiff will fairly and adequately protect the interests of the Classes because his interests do not conflict with the interests of any of the other

members of the Classes he seeks to represent.  Plaintiff has retained counsel competent and experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

**5.   Superiority, Federal Rule of Civil Procedure 23(b)(3).**

51.   A class action is superior to other available methods for a fair and efficient adjudication of this controversy as many members of the proposed class have damages arising from Volkswagen's wrongful course of conduct, which would not be susceptible to individualized litigation of this kind, including, but not limited to, the costs of experts and resources that may be required to examine the business practices in question.

52.   Given the relative size of damages sustained by the individual members of the Class, the diffuse impact of the damages, and homogeneity of the issues, the interests of members of the Class individually controlling the prosecution of separate actions is minimal.

53.   Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this Class Action Complaint that would preclude its maintenance as a class action.

**6.   Declaratory and Injunctive Relief: Federal Rule of Civil Procedure 23(b)(2).**

54.   Volkswagen has acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

55.   Plaintiff would like to purchase a new diesel-fueled vehicle that meets federal and state emission standards while maintaining the performance characteristics that Volkswagen advertised.  However, plaintiff will be unable

to discern whether any of Volkswagen's vehicles meet his requirements without purchasing and testing a new vehicle.  Plaintiff is therefore likely to again be misled by Volkswagen's "Clean Diesel" misrepresentations.

## I.   Any Otherwise-Applicable Statutes of Limitations are Tolled

### 1.   A. Discovery Rule Tolling

56.   The tolling doctrine was made for cases of concealment like this one. For the following reasons, any otherwise-applicable statutes of limitation have been tolled by the discovery rule with respect to all claims.

57.   Through the exercise of reasonable diligence, and within any applicable statutes of limitation, Plaintiff and members of the proposed Classes could not have discovered that Volkswagen was concealing and misrepresenting the true emissions levels of its vehicles, including but not limited to its use of defeat devices.

58.   As reported in the New York Times on September 19, 2015, the International Council on Clean Transportation, a research group, first noticed the difference between Volkswagen's emissions in testing laboratories and in normal use on the road. The International Council on Clean Transportation brought the defeat device issue to the attention of the EPA. The EPA, in turn, conducted further tests on the vehicles, and ultimately uncovered the unlawful use of the defeat device software. Thus, Volkswagen's deception with respect to its CleanDiesel engines, engine control systems, and "defeat devices" was painstakingly concealed from consumers and regulators alike.

59.   Plaintiff and the other Class members could not reasonably discover, and did not know of facts that would have caused a reasonable person to

suspect, that Volkswagen intentionally failed to report information within its knowledge to federal and state authorities, its dealerships, or consumers.

60.   Likewise, a reasonable and diligent investigation could not have disclosed that Volkswagen had information in its sole possession about the existence of its sophisticated emissions deception and that it concealed that information, which Plaintiff discovered only immediately before this action was filed.

### 2.   Tolling Due To Fraudulent Concealment

61.   Throughout the relevant time period, all applicable statutes of limitation have been tolled by Volkswagen's knowing fraudulent concealment and denial of the facts alleged in this Complaint.

62.   Instead of disclosing its emissions deception, or that the emissions from the Defeat Device Vehicles were far worse than represented, Volkswagen falsely represented that its vehicles complied with federal and state emissions standards.

### 3.   Estoppel

63.   Volkswagen was under a continuous duty to disclose to Plaintiff and the other Class members the facts that it knew about the emissions from Defeat Device Vehicles, and of those vehicles' failure to comply with federal and state laws.

64.   Although it had the duty throughout the relevant period to disclose to Plaintiff and Class members that it had engaged in the deception described in this Complaint, Volkswagen chose to evade federal and state emissions and clean air standards with respect to the Defeat Device Vehicles, and it

intentionally misrepresented its blatant lack of compliance with state law regulating vehicle emissions and clean air.

65.   Thus, Volkswagen is estopped from relying on any statutes of limitations in defense of this action.

## CAUSES OF ACTION

66.   Plaintiff does not plead, and hereby disclaims, causes of action under the Clean Air Act and regulations promulgated thereunder by the EPA. Plaintiff relies on these laws and regulations only to the extent that they provide a predicate basis of liability under the state and common laws cited in the following causes of action.

## COUNT ONE

### (Fraud, Deceit and/or Misrepresentation Under Common Law)
### On Behalf of Plaintiff and the Classes

67.   Plaintiff incorporates by reference all preceding paragraphs of this complaint as if fully set forth herein.

68.   As set forth above (*see supra*, ¶¶ 15-24), Volkswagen falsely represented material facts to Plaintiff and those similarly situated regarding its Defeat Device Vehicles. Specifically, Volkswagen represented to Plaintiff, and those similar situated, that the Defeat Device Vehicles were "green," "clean," "environmentally conscious," and had "high fuel efficiency and performance with low emissions." Further, Volkswagen represented that the TDI engines in the Defeat Device Vehicles were (i) "clean" engines; (ii) "50-state emissions compliant;" (iii) an "alternative for shoppers craving efficiency, low emissions, and unrivaled value all in one attractive package;" (iv) "really clean;" (v) "eco-friendly;" (vi) "not the kind of diesel engines that you find spewing sooty

exhaust like an old 18-wheeler;" (vii) "meet[ing] some of the strictest standards in the world;" (viii) "help[ing] reduce sooty emissions by up to 90%, giving you a fuel-efficient and eco-conscious vehicle;" (ix) not like the "old diesel realities," which were "[s]tinky, smoky, and sluggish;" (x) "eco-conscious;" and (xi) reducing smog and "meet[ing] the highest standards in all 50 states, thanks to ultra-low sulfur diesel (ULSD) fuel and innovative engine technology that burns cleaner."

69.   In addition to its representations applicable to all Defeat Device Vehicles, Volkswagen also represented that the Jetta: (i) was 50-state compliant; (ii) meets "the most stringent emissions standards in California;" and (iii) is the "Official Pace Car of the Environment."

70.   Volkswagen's representations were false, and Volkswagen knew that the representations were false when it made them.  Volkswagen knew that its vehicles met federal and state emissions standards only because Volkswagen had installed illegal defeat devices in the vehicles that altered the vehicles' emissions profiles when the vehicles were being tested for emissions standards compliance.  Volkswagen knew that in general operation, the defeat device vehicles would not meet federal and state emissions standards.

71.   Volkswagen intended that Plaintiff and those similarly situated would rely and act upon the above-identified representations and material omissions.

72.   Volkswagen also concealed, suppressed, and omitted the material fact that it had installed illegal defeat devices in its vehicles to bypass or render inoperative during normal operation of the vehicles the pollution controls that brought the vehicles into compliance with federal and state emission standards during emission testing.  Volkswagen concealed, suppressed and omitted material facts that would have revealed that the Defeat Device Vehicles did not

meet federal and state emissions standards in general operation while delivering the advertised levels of vehicle performance.

73.   Volkswagen has a duty to disclose these facts because it had exclusive knowledge of the installation of the defeat devices and because it made partial representations regarding the Defeat Device Vehicles' emissions and their compliance with federal and state standards.

74.   Plaintiff and those similarly situated reasonably relied on Volkswagen's representations and material omissions. Specifically, Plaintiff and those similarly situated purchased the Defeat Device Vehicles because they believed that those vehicles offered enhanced performance while at the same time reducing fuel emissions.  Plaintiff and those similarly situated could not have uncovered the falsity of Volkswagen's representations.

75.   Because they reasonably relied on Volkswagen's false representations, Plaintiff and those similarly situated were harmed in an amount which will be proved at trial.

76.   Because Defendant's conduct was wanton, deliberate, oppressive and malicious, or in reckless disregard of Plaintiff's and the Class members rights, Plaintiff and the Class members are entitled to an award of punitive or exemplary damages in an amount to be determined at trial.

77.

## COUNT TWO

### (Breach of Contract)

### On Behalf of Plaintiff and the Classes

78.   Plaintiff incorporates by reference all preceding paragraphs of this complaint as if fully set forth herein.

79.   Plaintiff and those similarly situated entered into a written contract with Volkswagen to purchase and/or lease a Defeat Device Vehicle.

80.   Pursuant to the terms of that contract, Volkswagen was to deliver to Plaintiff and those similarly situated a vehicle that complied with federal and state emissions requirements and that met the performance characteristics in Volkswagen's advertisements, in exchange for payment of the purchase price.

81.   Plaintiff and those similarly situated materially performed all of their obligations under their respective contracts.

82.   Volkswagen materially breached its contractual obligations by delivering to Plaintiff and those similarly situated Defeat Device Vehicles, which are defective and do not reflect the characteristics of the vehicles for which Plaintiff and those similarly situated contracted.

83.   As a direct and proximate result of Volkswagen's breach of contract, Plaintiff and those similarly situated have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT THREE

### (Fraudulent Inducement/Rescission)

### On Behalf of Plaintiff and the Classes

84.   Plaintiff incorporates by reference all preceding paragraphs of this complaint as if fully set forth herein.

85.   As set forth above (*see supra*, ¶¶ 15-24), Volkswagen falsely represented material facts to Plaintiff and those similarly situated regarding its Defeat Device Vehicles. Specifically, Volkswagen represented to Plaintiff, and

those similar situated, that the Defeat Device Vehicles were "green," "clean," "environmentally conscious," and had "high fuel efficiency and performance with low emissions." Further, Volkswagen represented that the TDI engines in the Defeat Device Vehicles were (i) "clean" engines; (ii) "50-state emissions compliant;" (iii) an "alternative for shoppers craving efficiency, low emissions, and unrivaled value all in one attractive package;" (iv) "really clean;" (v) "eco-friendly;" (vi) "not the kind of diesel engines that you find spewing sooty exhaust like an old 18-wheeler;" (vii) "meet[ing] some of the strictest standards in the world;" (viii) "help[ing] reduce sooty emissions by up to 90%, giving you a fuel-efficient and eco-conscious vehicle;" (ix) not like the "old diesel realities," which were "[s]tinky, smoky, and sluggish;" (x) "eco-conscious;" and (xi) reducing smog and "meet[ing] the highest standards in all 50 states, thanks to ultra-low sulfur diesel (ULSD) fuel and innovative engine technology that burns cleaner."

86.   In addition to its representations applicable to all Defeat Device Vehicles, Volkswagen also represented that the Jetta: (i) was 50-state compliant; (ii) meets "the most stringent emissions standards in California;" and (iii) is the "Official Pace Car of the Environment."

87.   Volkswagen's representations were false, and Volkswagen knew that the representations were false when it made them.  Volkswagen knew that its vehicles met federal and state emissions standards only because Volkswagen had installed illegal defeat devices in the vehicles that altered the vehicles' emissions profiles when the vehicles were being tested for emissions standards compliance.  Volkswagen knew that in general operation, the defeat device vehicles would not meet federal and state emissions standards.

88.   Volkswagen also concealed, suppressed, and omitted the material fact that it had installed illegal defeat devices in its vehicles to bypass or render inoperative during normal operation of the vehicles the pollution controls that brought the vehicles into compliance with federal and state emission standards during emission testing.  Volkswagen concealed, suppressed and omitted material facts that would have revealed that the Defeat Device Vehicles did not meet federal and state emissions standards in general operation while delivering the advertised levels of vehicle performance.

89.   Volkswagen has a duty to disclose these facts because it had exclusive knowledge of the installation of the defeat devices and because it made partial representations regarding the Defeat Device Vehicles' emissions and their compliance with federal and state standards.

90.   Volkswagen intended that Plaintiff and those similarly situated would rely and act upon the above-identified representations and material omissions in entering into contracts with Volkswagen to purchase Defeat Device Vehicles.

91.   Plaintiff and those similarly situated reasonably relied on Volkswagen's representations and material omissions when entering into contracts with Volkswagen to purchase Defeat Device Vehicles. Specifically, Plaintiff and those similarly situated purchased the Defeat Device Vehicles because they believed that those vehicles offered enhanced performance while at the same time reducing fuel emissions.  Plaintiff and those similarly situated could not have uncovered the falsity of Volkswagen's representations.

92.   If Volkswagen had told the truth about its Defeat Device Vehicles, Plaintiff and those similarly situated would not have entered into contracts with Volkswagen to purchase those vehicles.

93.   Plaintiff and those similarly situated are entitled to rescission of their contracts with Volkswagen and return of the full purchase price of the vehicle

## COUNT FOUR

### (Breach of Implied Covenant of Good Faith and Fair Dealing)
### On Behalf of Plaintiff and the Massachusetts Class

94.   Plaintiff incorporates by reference all preceding paragraphs of this complaint as if fully set forth herein.

95.   Plaintiff and those similarly situated entered into contracts with Volkswagen to purchase and/or lease a Defeat Device Vehicle.

96.   Every contract in Massachusetts contains an implied covenant of good faith and fair dealing.

97.   As set forth above (*see supra*, ¶¶ 15-24), Volkswagen breached the implied covenant of good faith and fair dealing by engaging in a scheme to mislead Plaintiff and those similarly situated regarding the emissions and performance of its Defeat Device Vehicles.  Specifically, Volkswagen lied to Plaintiff and those similarly situated regarding the fuel emissions and performance of the Defeat Device Vehicles.  Volkswagen also intentionally hid from Plaintiff and those similarly situated the fact that Volkswagen had installed devices in its vehicles to alter emissions profiles during compliance inspections, allowing Volkswagen to pass inspection even though the vehicles emitted up to forty times the legal level of pollutants during normal operation.

98.   As a direct and proximate result of Volkswagen's breach of the implied covenant of good faith and fair dealing, Plaintiff and those similarly situated have been damaged in an amount to be proven at trial.

## COUNT FIVE

### (Breach of Express Warranty)

### On Behalf of Plaintiff and the Classes

99.   Plaintiff incorporates by reference all preceding paragraphs of this complaint as if fully set forth herein.

100. As set forth above (*see supra*, ¶¶15-24), Volkswagen made numerous representations, descriptions, and promises to Plaintiff and those similarly situated regarding the performance and emission controls of the Defeat Device Vehicles.

101. However, Volkswagen knew, or should have known, that its representations, descriptions, and promises were false.  Volkswagen knew the Defeat Device Vehicles were defective, and did not possess the performance and emissions control characteristics Volkswagen had represented.  Volkswagen intentionally installed an illegal defeat device into the vehicles to allow those vehicles to pass emissions inspections and therefore to appear to possess the performance and emissions control characteristics Volkswagen had represented those vehicles possessed.

102. Moreover, as required by law, Volkswagen provided a Federal Emissions Warranty to Plaintiff and those similarly situated.  This included a "performance warranty" and a "design and defect warranty."  In the event that a vehicle fails an emissions test, these warranties cover all emissions related parts for 2 years or 24,000 miles (whichever comes first), with the catalytic converter, engine control unit, and onboard diagnostic device covered for 8 years or 80,000 miles (whichever comes first). These warranties are directly applicable to the Defeat Device Vehicles.

103. Volkswagen breached these express warranties by selling the Defeat Device Vehicles with a defeat device that rendered the vehicles' emission control systems defective.  Due to the operation of the defeat device, the Defeat Device Vehicles did not comply with emissions standards set by federal law. The defeat devices cannot be repaired or redressed without materially altering the advertised estimated fuel economy and other performance characteristics of the vehicles.

104. As a direct and proximate result of Volkswagen's breach of these express warranties, Plaintiff and those similarly situated have suffered damages in an amount to be determined at trial.

## COUNT SIX

### (Breach of Implied Warranty of Merchantability)
### On Behalf of Plaintiff and the Classes

105. Plaintiff incorporates by reference all preceding paragraphs of this complaint as if fully set forth herein.

106. The Defeat Device Vehicles that Plaintiff and those similarly situated purchased are defective because they are not reasonably fit for the intended use and the reasonably foreseeable use of operation in compliance with federal and state emissions laws.  In fact, Volkswagen installed a defeat device in the vehicles that rendered the emissions control systems defective.  Due to the operation of the defeat device, the Defeat Device Vehicles did not comply with emissions standards set by federal law during normal operation of the vehicles.

107. As a direct and proximate result of Volkswagen's breach of the implied warranty of merchantability, Plaintiff and those similarly situated have suffered damages in an amount to be determined at trial.

COUNT SEVEN

**(Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 2301 *et seq.*)**

**On Behalf of Plaintiff and the Classes**

108. Plaintiff incorporates by reference all preceding paragraphs as if fully set forth herein.

109. Volkswagen's Defeat Device Vehicles are a "consumer product," as that term is defined in 15 U.S.C. § 2301(1).

110. Plaintiff and Class members are "consumers," as that term is defined in 15 U.S.C. § 2301(3).

111. Volkswagen is a "warrantor" and "supplier" as those terms are defined in 15 U.S.C. § 2301(4) and (5).

112. Volkswagen provided purchasers and lessees of Defeat Device Vehicles multiple written warranties as defined by 15 U.S.C. § 2301(6).

113. **Manufacturer's Warranty**. Defendants provided Plaintiff and those similarly situated with a Manufacturer's Warranty, which provides "bumper-to-bumper" limited express warranty coverage for a minimum of 3 years or 36,000 miles, whichever comes first. This warranty covers emissions related repairs. This warranty is directly applicable to Defeat Device Vehicles.

114. **Federal Emissions Warranty.** Consistent with federal law, Defendants provided Plaintiff and those similarly situated with a "performance warranty" and a "design and defect warranty." In the event that a vehicle fails an emissions test, these warranties cover all emissions related parts for 2 years or 24,000 miles (whichever comes first), with the catalytic converter, engine control unit, and onboard diagnostic device covered for 8 years or 80,000 miles (whichever comes first). These warranties are directly applicable to the Defeat Device Vehicles.

115. Volkswagen breached these express warranties by selling the Defeat Device Vehicles with a defeat device that rendered the vehicles' emission control systems defective.  Due to the operation of the defeat device, the Defeat Device Vehicles did not comply with emissions standards set by federal law.  The defeat devices cannot be repaired or redressed without materially altering the advertised estimated fuel economy and other performance characteristics of the vehicles.

116. Volkswagen also provided Plaintiff and those similarly situated with "implied warranties," as that term is defined in 15 U.S.C. § 2301(7).  As described more fully above, Volkswagen impliedly warranted that the Defeat Device Vehicles possessed specific performance and emissions control characteristics that the vehicles in fact did not possess, and which Volkswagen knew the vehicles did not possess.  As a result, the Defeat Device Vehicles are defective.

117. As a direct and proximate result of Volkswagen's breach of these express and implied warranties, Plaintiff and those similarly situated have suffered damages in an amount to be determined at trial.

### MASS G.L. C. 93A NOTICE

118. Plaintiff hereby provides Volkswagen with notice and demand that within thirty (30) days, Volkswagen correct, repair, replace or otherwise rectify the unlawful, unfair, false and/or deceptive practices complained of herein.  Volkswagen's failure to do so will result in Plaintiff amending this Class Action Complaint to seek, pursuant to Mass. G.L. c. 93A, § 9, on behalf of himself and those similarly situated Massachusetts Subclass members, compensatory damages and punitive damages due to Volkswagen's knowing and intentional unfair and deceptive practices.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and those similarly situated, respectfully requests that the Court enter judgment against Volkswagen as follows:

A.  Certification of the proposed Nationwide Class and Massachusetts Subclass, including appointment of Plaintiff's counsel as class counsel;

B.  An order temporarily and permanently enjoining Volkswagen from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

C.  An order providing injunctive relief in the form of a recall or free replacement program;

D.  An award of compensatory damages in an amount to be determined at trial;

E.  An award of punitive damages in an amount to be determined at trial;

F.  Rescission of the Defeat Device Vehicle purchase contracts and full restitution of the purchase prices;

G.  An order requiring Volkswagen to pay both pre- and post-judgment interest on any amounts awarded;

H.  For reasonable attorney's fees and the costs of suit incurred;

I.  For such further relief as this Court may deem just and proper;

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury as to all issues.

Dated:  September 22, 2015                    **GUTRIDE SAFIER LLP**

                                             /s/ Marie A.McCrary

                                             Marie A. McCrary, Esq.
                                             (BBO 86707)
                                             Matthew T. McCrary, Esq.,
                                             (BBO 686708)
                                             100 Pine Street, Suite 1250
                                             San Francisco, CA 94111